Filed 1/7/26  Quiroga v. Fidelity National Title Co. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VERONICA QUIROGA, | D085712 |
| Petitioner and Appellant, | |
| v. | (Super. Ct. No. PROPS1901062) |
| FIDELITY NATIONAL TITLE COMPANY, | |
| Objector and Respondent. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Douglas K. Mann, Judge.  Affirmed.

The DLJ Law Firm and Dorian L. Jackson, for Petitioner and Appellant.

Fidelity National Law Group and Josette D. Johnson, for Objector and Respondent.

Petitioner and appellant Veronica Quiroga appeals from a judgment entered after the probate court sustained without leave to amend the

demurrer of objector and respondent Fidelity National Title Company (Fidelity) to Quiroga's third amended petition's financial elder abuse cause of action. In addition to alleging that certain individual defendants took steps to embezzle money from her father, Jimmy Crist (Crist), Quiroga alleged that the defendants coerced Crist to sell his real property to them at below market value, and that Fidelity assisted them in committing financial elder abuse because it had actual knowledge of the property's true value, as well as those defendants' illegal actions. The court ruled the pleading lacked facts alleging that Fidelity was aware of Crist's age, failing health, or condition so as to maintain a financial elder abuse cause of action, and there were insufficient facts showing Fidelity either assisted in or had knowledge of the other defendants' alleged wrongful conduct. Quiroga contends the court erred because (1) such knowledge on Fidelity's part was not required as a matter of law and (2) the court applied incorrect legal standards, including by relying on Fidelity's assertion that a clear and convincing standard of proof applied, as well as a code section—Welfare and Institutions Code[1] section 15610.30, subdivision (a)(3) of the Elder Abuse and Dependent Adult Civil Protection Act, § 15600 et seq. (the Elder Abuse Act or the Act)—that she did not plead as the basis for her claim. She contends that applying the proper legal standards, she stated a valid financial elder abuse claim against Fidelity. We disagree with these contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In keeping with settled review standards on a demurrer, we state the background facts from the well-pleaded allegations of Quiroga's complaint, disregarding contentions, deductions, and conclusions of fact or law. (*John's*

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

*Grill, Inc. v. The Hartford Financial Services Group, Inc.* (2024) 16 Cal.5th 1003, 1008; *Juarez v. San Bernardino City Unified School District* (2024) 106 Cal.App.5th 1213, 1218.)

In 1999, Crist and his spouse purchased property in Big Bear City (the property). Their mortgage was secured by a deed of trust in the amount of $49,591. In 2017, Crist's spouse passed away, which took a heavy toll on him. Concerned about his well-being, Quiroga invited Crist to live with her, but Crist declined because he was concerned that his son, Jimmy Crist, Jr., and his son's girlfriend, Vanessa Barrera-Cruz, would steal his belongings if he was not physically present. Crist did not trust Barrera-Cruz.[2] Despite that, in January 2018, he purportedly executed a power of attorney naming her as his attorney in fact. Rather than managing Crist's finances for his benefit, Barrera-Cruz and Crist, Jr. began embezzling his money, leaving him destitute and unable to pay his mortgage. Barrera-Cruz and Crist, Jr. later moved into the property.

In October 2018, the trustee on the trust deed recorded a notice of default against the property, indicating over $7,010.79 past due. Though Crist's monthly mortgage payment was approximately $445 and he received over $800 in Social Security benefits as well as rental income, his mortgage had not been paid while Barrera-Cruz was managing his affairs.

At some point, John and Michelle Andrade decided to purchase the property, and prepared a California Association of Realtors form notice of default purchase agreement (purchase agreement). The purchase agreement,

---

[2] Quiroga alleged that Barrera-Cruz had previously been convicted of or pleaded guilty to misdemeanor crimes involving fraud or moral turpitude. She alleged Barrera-Cruz in 2000 and 2001 pleaded guilty to other crimes involving fraud and moral turpitude, and her probation was revoked for failing to comply with certain terms. Quiroga alleged that Crist said Barrera-Cruz and Crist, Jr had keys to Crist's property.

which indicated it was subject to the Home Equity Sales Contract Act (HESCA), was purportedly executed by Crist on December 13, 2018. The purchase agreement was contradictory and ambiguous, stating in one place that the purchase price was $39,000, substantially lower than any comparison property within a square mile 90 days before the purchase agreement's execution, and in another place stating the purchase price was $80,000. It also stated that escrow was to close within 30 days after acceptance, which was on or before January 14, 2019. It further provided that the Andrades were to deposit $39,000 with escrow within 30 days of December 13, but they did not timely deposit that money.

An addendum to the purchase agreement contradicted its terms, stating on the one hand that the purchase was subject to the existing loan such that the loan was not part of the purchase price, and on the other that the mortgage payoff plus past due property taxes, liens and judgments would come out of the seller's sales proceeds. The Andrades were aware that the property was worth more than their offered purchase price, and they requested $200,000 in title insurance from Fidelity for the property.

The Andrades opened a title insurance policy with Fidelity in December 2018. Before Fidelity granted the policy, the Andrades sent it a copy of the purchase agreement and its "ancillary" documents, as well as a property valuation they had prepared. Based on those documents, the existing mortgage, liens and property taxes were excluded from the title policy. That same month, Crist purportedly executed an affidavit of death of joint tenant (affidavit of death), a grant deed and other documents showing differing dates as to when he had signed the purchase agreement. Though Crist was given a copy of Michelle Andrade's California Department of Real Estate web page, he failed to notice that her license had expired two months before he

4

purportedly signed the purchase agreement. A few hours after purportedly signing the grant deed, Crist fell ill. He died on December 25, 2018. Crist, Jr. and Barrera-Cruz were aware of Crist's death.

The purchase agreement indicated that title to the property could not be transferred to the buyer until escrow closed 30 days later. It also indicated that no agents were involved and no agent commissions were required. But the Andrades handled the escrow for the transaction, preparing the deed, informing Fidelity when to record it, paying all liens, preparing the seller's closing statement and issuing a check for the sales proceeds.

At the Andrades' instruction, Fidelity recorded the affidavit of death and deed on December 27, 2018. That same afternoon, the Andrades communicated with another defendant to obtain a refinance loan on the property and included a copy of the purchase agreement indicating an $80,000 purchase price. The Andrades indicated that the property was valued at $150,000.

In January 2019, the Andrades caused Barrera-Cruz to execute two addenda to the purchase agreement, in which Barrera-Cruz agreed either $3,600 (addendum No. 1) or $3,200 (addendum No. 2) would be taken from the seller proceeds to cover rent through April 2019. Later that month, the Andrades' refinance loan closed and the deed of trust was recorded, and the Andrades received $19,167.76 in proceeds. On January 29, 2019, the Andrades drafted the seller's closing statement, which indicated the mortgage loan and other liens were taken from the seller's proceeds, and that Crist was due $27,531.04. That day, 15 days after the escrow was scheduled to close, the Andrades issued a check for the sales proceeds directly to Barrera-Cruz.

5

*Quiroga's Lawsuit*

Quiroga sued Crist, Jr., Barrera-Cruz and others. She eventually filed a second amended petition against them, the Andrades, Fidelity and others. Among other claims, Quiroga sought to allege financial elder abuse against Fidelity as well as Crist, Jr., Barrera-Cruz and the Andrades. Quiroga alleged on information and belief that at all times relevant, Crist was age 65 or older. She alleged the Andrades "took [Crist's] real property with the intent to defraud him and [his] estate" by coercing him to sell his property to them for $38,000, though it was worth at least $165,000 on the date Crist allegedly executed the deed. She alleged Barrera-Cruz and Crist, Jr. assisted the Andrades with taking Crist's property; Barrera-Cruz and Crist, Jr. "isolated [Crist] from [her] and other family members; would use [Crist's] money for their own purposes leaving [Crist] destitute and without proper finances to take care of himself; moved their children into the property with [Crist] to prevent [her] or others from assisting [Crist]; and made false statements to [Crist] that [Quiroga] no longer cared for him or wanted to visit with him." She alleged Crist was afraid of disobeying Barrera-Cruz and Crist, Jr. and "depended upon them for all the aspects of his daily life."

As for Fidelity, Quiroga alleged Fidelity and others "also assisted the Andrade[s]" in committing financial elder abuse. Making legal arguments, she alleged Fidelity and others "had actual knowledge of the Andrade[s']" wrongful conduct." More specifically, Quiroga alleged Fidelity (and other defendants):

• "knew the Andrade[s] were real estate professionals licensed with the state of California"; "had a copy of the [purchase agreement] in their possession and knew of its terms"; and "had actual knowledge the Andrade[s]

6

were acting in violation of law by acting as escrow officers during the transaction."

- "knew a notice of default had been recorded against the Property" and "knew the Andrade[s] were required by law to comply with the HESCA. However, the [purchase agreement], which [Fidelity] possessed a copy of, clearly indicates numerous violations of the HESCA, including, but not limited to, the violation of the next to signature notice which is essential the HESCA protections [*sic*] of vulnerable members of the public. . . . As such, [Fidelity] had actual knowledge the Andrade[s] violated the HESCA and [Crist's] right to cancel the [purchase agreement] never expired."

- "had a copy of the [purchase agreement] in [its] possession and knew of its terms. Additionally, [Fidelity was] provided with a copy of the true value of the property and thereby knew the property was being sold for fifty-five and a half percent (51.5) [*sic*] below market value. As such, [Fidelity] had actual knowledge the Andrade[s] were defrauding [Crist] and the conclusive presumption of undue influence applied to the Andrade[s]."

- "had a copy of the [purchase agreement] and its ancillary documents in their possession and knew of its terms" and "[a]s such . . . had actual knowledge the Andrade[s] paid $1,245.33 to purchase a property valued at $150,000. As such, [Fidelity] had actual knowledge the Andrade[s] were defrauding [Crist] and the conclusive presumption of undue influence applied to the Andrade[s]."

Quiroga further alleged that "the [purchase agreement] by its very terms indicates title to the Property cannot be transferred until escrow closes on the transaction. However, the Andrade[s] transferred title forty-seven (47) days before the transaction closed. As such, [Fidelity] had actual

7

knowledge the Andrade[s] violated the terms of the [purchase agreement] rendering the transaction void ab initio."

Fidelity demurred to the second amended petition, arguing the pleading failed to state a financial elder abuse cause of action against it, and that Quiroga lacked standing to assert such a claim. In part, it argued the petition did not demonstrate its involvement in the alleged elder financial abuse and failed to include facts showing its actions were improper. It argued "[t]itle insurance companies are not private investigators and are not equipped or able to investigate each potential or alleged instance of financial abuse of an elder before a transaction has even occurred" and to impose an obligation otherwise "would exceed the scope of Fidelity's duties as a title insurer." Quiroga opposed the motion.

The probate court sustained the demurrer with leave to amend, ruling "sufficient facts have not been shown." Thereafter, Quiroga filed a third amended petition. Quiroga made edits to the financial elder abuse claim against Fidelity, adding allegations that:

• Fidelity and other defendants "had actual knowledge the Andrade[s] were violating the law by conducting the escrow in a For Sale By Owner Transaction";

• Fidelity had "actual knowledge the Andade[s]' . . . conduct was wrongful because it violated yet another statutory scheme [the HESCA]";

• Fidelity "knew the [purchase agreement] by its very terms indicates title to the Property cannot be transferred until escrow closed on the transaction, which is when [Crist] would have been paid for transferring the property" but "the Andrade[s] transferred title forty-seven (47) days before the transaction closed in violation of the express terms of the [purchase agreement]";

8

• Fidelity "had actual knowledge of the property actual value [*sic*] of no less than $150,000";

• Fidelity "insured the property for two and a half (2.5) times the [purchase agreement] price to purchase the property in violation of industry standards and Fidelity's internal policies."

Quiroga then made a legal argument that financial elder abuse occurs when one wrongfully retains an elder's property, and that one assists the commission of financial elder abuse when they assist one who wrongfully retains an elder's property. She alleged "[t]he Andrade[s] engaged in the taking of the property of [Crist]" and "[t]he other cited respondents assisted in the taking or retention of the property of an elder with actual knowledge that what the Andrade[s] . . . were doing was wrongful as indicated above."

Fidelity demurred again on the same grounds. It argued Quiroga had not pleaded the financial elder abuse claim with the required particularity; that her allegations against it merely established it was the title insurer to the transaction. Fidelity maintained Quiroga was required to allege "clear and convincing factual allegations" but there were "no specific allegations that [it] acted with actual knowledge of wrongdoing or with the requisite intent to defraud required to state a financial elder abuse cause of action." Further, Fidelity argued the pleading was devoid of facts that it had aided and abetted the Andrades, or that it was actually aware of any alleged wrongful conduct by anyone. It again argued Quiroga lacked standing to bring a financial elder abuse claim against it. Fidelity argued Quiroga could not demonstrate another opportunity to amend could cure the facially deficient pleading.

The probate court sustained Fidelity's demurrer without leave to amend, dismissing the financial elder abuse claim against Fidelity and

9

dismissing the action against Fidelity without prejudice. It ruled: "Even when liberally construed, the allegations in connection with the elder abuse cause of action lack facts and specificity such that they amount to mere allegations rather than facts sufficient to support a cause of action. There are no facts alleging that Fidelity was aware of [Crist's] age or failing health when the title insurance policy was issued, which is a necessary component of elder abuse. There are no facts showing actual knowledge of abuse by Fidelity to support this cause of action. Although there are facts to suggest that there were violations of statutes in connection with the sale of the property, there are not facts alleged to show that Fidelity knew of the alleged elder abuse or was aware of [Crist's] condition, an issue into which the [purchase agreement] provides no insight. Thus, there are insufficient facts showing that Fidelity either assisted in or had knowledge of the Andrade Respondents alleged wrongful conduct."

Quiroga appeals from the judgment of dismissal.

## DISCUSSION

### I. *Standard of Review*

"A 'demurrer tests the pleading alone, and not the evidence or the facts alleged. Thus, a demurrer will be sustained only where the pleading is defective on its face.'" (*Citizens for a Responsible Caltrans Decision v. Department of Transportation* (2020) 46 Cal.App.5th 1103, 1116.) On appeal from a judgment of dismissal based on an order sustaining a demurrer, "'we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.'" (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768; *Citizens*, at p. 1116.) We assume the truth of the well-pleaded allegations, and consider matters that may be judicially noticed (*Mathews*, at p. 768; *Brown v. USA Taekwondo* (2021) 11

10

Cal.5th 204, 209), but we disregard contentions, deductions or conclusions of fact or law, and we may disregard any allegations that are contrary to the law or to a fact of which judicial notice may be taken. (*Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 734.) We give the operative complaint a reasonable interpretation, reading it as a whole and its parts in their context. (*Mathews v. Becerra*, at p. 768.)

" 'If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer. "[W]e are not limited to plaintiffs' theory of recovery in testing the sufficiency of their complaint against a demurrer, but instead must determine if the *factual* allegations of the complaint are adequate to state a cause of action under any legal theory . . . ." ' " (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370.) The complaint will " ' "survive[ ] a general demurrer insofar as its states, however inartfully, facts disclosing some right to relief." ' " (*Thomas v. Regents of University of California* (2023) 97 Cal.App.5th 587, 611-612.) The possible inability or difficulty in proving the complaint's allegations is not a factor. (*New Livable California v. Association of Bay Area Governments* (2020) 59 Cal.App.5th 709, 714.) "We may affirm on any basis stated in the demurrer, regardless of the ground on which the trial court based its ruling." (*Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 549, quoting *Carman v. Alvord* (1982) 31 Cal.3d 318, 324.)

When a demurrer is sustained without leave to amend, " 'we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse.' " (*County of Santa Clara v. Superior Court* (2023) 14 Cal.5th 1034,

1041.)  The plaintiff can propose amendments for the first time on appeal. (Code Civ. Proc., § 472c, subd. (a).)

## II.  *Financial Elder Abuse*

We review the relevant provisions of the Elder Abuse Act in effect at the time of the transactions alleged in Quiroga's complaint.  (Accord, *Das v. Bank of America, N.A.*, *supra*, 186 Cal.App.4th at p. 735.)  " ' "[F]inancial abuse" claims are authorized in the Elder Abuse Act by section 15657.5, which works hand-in-hand with a set of defined terms in sections 15610.30 and 15610.70.' " (*Newman v. Casey* (2024) 99 Cal.App.5th 359, 374.)[3]

Section 15610.30 provides in part:  "(a) 'Financial abuse' of an elder . . . occurs when a person or entity does any of the following:  [¶]  (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both.  [¶]  (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both. [¶]  (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking,

---

[3]    Section 15657.5 provides in part:  "(a) Where it is proven by a preponderance of the evidence that a defendant is liable for financial abuse, as defined in Section 15610.30, in addition to compensatory damages and all other remedies otherwise provided by law, the court shall award to the plaintiff reasonable attorney's fees and costs.  The term 'costs' includes, but is not limited to, reasonable fees for the services of a conservator, if any, devoted to the litigation of a claim brought under this article.  [¶]  (b) Where it is proven by a preponderance of the evidence that a defendant is liable for financial abuse, as defined in Section 15610.30, and where it is proven by clear and convincing evidence that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of the abuse, in addition to reasonable attorney's fees and costs set forth in subdivision (a), compensatory damages, and all other remedies otherwise provided by law, the limitations imposed by Section 377.34 of the Code of Civil Procedure on the damages recoverable shall not apply."  (§ 15657.5, subds. (a), (b).)

12

secreting, appropriating, obtaining, or retaining, real or personal property of an elder . . . by undue influence, as defined in Section 15610.70."

" 'Section 15610.30, subdivision (c) defines the phrase "[t]akes, secretes, appropriates, obtains, or retains" as occurring "when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder or dependent adult." Section 15610.30, subdivisions (a), (b), and (c), together, define the requisite level of culpability broadly. The defendant will be liable for "depriv[ation]" (§ 15610.30, subd. (c)) of an elder's property that is taken "for a wrongful use or with intent to defraud" (*id.*, subd. (a)(1), (2)), *or* that is committed by "undue influence" (*id.*, subd. (a)(3)).' " (*Newman v. Casey*, *supra*, 99 Cal.App.5th at p. 374, quoting *Mahan v. Charles W. Chan Ins. Agency, Inc.*. (2017) 14 Cal.App.5th 841, 856-857.)[4] A "deprivation" is a "taking away of anything enjoyed; dispossession, loss." (*Mahan*, at p. 861.)

Subdivision (b) of section 15610.30 defines when a "wrongful use" occurs: "A person or entity shall be deemed to have taken, secreted,

---

[4] Quiroga has asked for leave to file a late reply brief. We grant the request and have considered that brief. In it, Quiroga disclaims any attempt to allege that Fidelity committed financial elder abuse by undue influence. Section 15610.70 defines undue influence to mean "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (§ 15610.70, subd. (a).) The statute requires certain factors to be considered in determining whether a result was produced by undue influence: the victim's vulnerability; the influencer's apparent authority, actions or tactics; and the equity of the result. (§ 15610.70, subd. (a)(1)-(3); see *Newman v. Casey*, *supra*, 99 Cal.App.5th at p. 375; *Mahan v. Charles W. Chan Ins. Agency, Inc.*, *supra*, 14 Cal.App.5th at pp. 856-857.) Absent allegations showing contact between any Fidelity representative and Crist, we agree Quiroga could not maintain her claim on a theory of undue influence.

appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder . . . ." (See *Newman v. Casey, supra,* 99 Cal.App.5th at pp. 374-375.)

In *Das v. Bank of America, N.A., supra,* 186 Cal.App.4th 727, the Court of Appeal examined the pleading sufficiency of elder abuse claims by a plaintiff against a financial institution that had issued a mortgage loan to her father and transferred funds at his request after he fell victim to scams. (*Id.* at pp. 443-444.) The plaintiff alleged that in arranging the transfers, her father requested hundreds of bank wire forms, and some of the bank's employees " 'wonder[ed]' about his state of mind" but "[d]espite the suspicious nature of the transfers, [the bank] never made a report of suspected financial abuse to a local law enforcement or adult protective agency, as required under the elder abuse statutes . . . ." (*Id.* at p. 733.)

Considering versions of sections 15657.6 and 15610.30 in effect between 2006 and 2008 (*Das v. Bank of America, N.A., supra,* 186 Cal.App.4th at p. 735 & fn. 5), the Court of Appeal first assumed section 15657.5 created an independent cause of action. (*Id.* at p. 744.)[5] It held the plaintiff's allegations did not establish the bank directly engaged in financial abuse.

_____

[5] *Das* pointed out that in 2008, the Legislature amended section 15610.30 to add the word "obtains" and "obtaining" to subdivisions (a)(1) and (a)(2); added subdivision (a)(3) as to undue influence; and added to the subdivision (b) provision governing wrongful use a requirement that the entity taking or retaining the property "knew or should have known that this conduct is likely to be harmful to the elder . . . ." (Stats. 2008, ch. 475, § 1, p. 3365; *Das v. Bank of America, N.A., supra,* 186 Cal.App.4th at pp. 735-736.) As in *Das,* we need not resolve whether section 15657.5 creates a new cause of action (*id.* at p. 744), an argument the parties do not address, because assuming it does, Quiroga cannot state such a claim.

14

(*Id*. at p. 744.) "Nothing in [the plaintiff's] complaint suggests that [the bank], in issuing a loan to [her father] and transferring funds at his request, obtained his property for an improper use, or acted in bad faith or with a fraudulent intent." (*Ibid*.)

It further held the complaint's allegations did not establish the bank assisted third parties in financial abuse. (*Das v. Bank of America, N.A.*, *supra*, 186 Cal.App.4th at p. 744.) Because the Act did not define the term "assists," the appellate court interpreted the statute in light of the common law rule—in effect at the time of section 15610.30's enactment or amendment—that subjected a defendant to liability for aiding and abetting an intentional tort. (*Ibid*.) " ' " 'Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.' " ' " (*Ibid*., quoting *Casey v. U.S. National Bank Association* (2005) 127 Cal.App.4th 1138, 1144.) *Das* explained that "[u]nder that rule, a bank may be liable as an aider and abetter of a tort if the bank, in providing ordinary services, 'actually knew those transactions were assisting the customer in committing a specific tort.' " (*Das*, at p. 745.) It concluded that "when, as here, a bank provides ordinary services that effectuate financial abuse by a third party, the bank may be found to have 'assisted' the financial abuse only if it knew of the third party's wrongful conduct." (*Ibid*.)

In *Das*, the plaintiff's complaint's allegations were insufficient because she had not "alleged that [the bank] knew about the schemes that victimized her father . . . ." (*Das v. Bank of America, N.A.*, *supra*, 186 Cal.App.4th at p.

15

745.) " '[O]n demurrer, a court must carefully scrutinize whether the plaintiff has alleged the bank had actual knowledge of the underlying wrong it purportedly aided and abetted.' " (*Ibid.*, quoting *Casey v. U.S. National Bank Association*, *supra*, 127 Cal.App.4th at p. 1152.)

The *Das* court took its language concerning how to examine allegations of the actual knowledge element from *Casey v. U.S. National Bank Association*, whose holding stemmed in part from the limited duties of banks. (*Das v. Bank of America, N.A.*, *supra*, 186 Cal.App.4th at p. 745.) *Casey* involved a trustee's claim that banks aided and abetted a breach of fiduciary duty (looting a debtor corporation by certain officers). There, the Court of Appeal in assessing a demurrer was careful to note that banks had no duty to nondepositors to police, prevent wrongdoing (such as commingling, improper disbursements, or misappropriation), or disclose an account holders' suspicious activities. (*Casey v. U.S. National Bank Association*, *supra*, 127 Cal.App.4th at pp. 1149-1152.) Thus, "the banks' alleged knowledge of the [alleged wrongdoers'] suspicious account activities—even money laundering— *without more,* does not give rise to tort liability for the banks. On the other hand, it is equally clear that if the Trustee can allege the banks knew the [wrongdoers] were stealing corporate funds and knowingly assisted the[m] . . . in laundering this stolen money, those allegations would suffice to state a claim for aiding and abetting the theft (or breach of fiduciary duty). This case thus involves the intersection of two distinct legal principles—one that strictly limits a bank's duties to nondepositors and another that extends tort liability to anyone who knowingly aids and abets the tort of another." (*Id.* at pp. 1151-1152.)

These principles affected the analysis of the pleadings' sufficiency: "Reconciling these competing principles within the sensitive context of a

16

claim against a bank for aiding and abetting a customer's wrongdoing *depends on a strict application of the pleading requirement for the knowledge element of the aiding and abetting claim.* In other words, on demurrer, a court must carefully scrutinize whether the plaintiff has alleged the bank had actual knowledge of the underlying wrong it purportedly aided and abetted. If narrowly circumscribed in this fashion, such an aiding and abetting claim against a bank is a reasonable exception to the case law limiting bank duties to nondepositors." (*Casey v. U.S. National Bank Association*, *supra*, 127 Cal.App.4th at p. 1152, italics added.)

The court ultimately held the pleadings were insufficient: "The second amended complaint contains no allegation the banks knew the [wrongdoers] were misappropriating funds from [the corporation], or that the money deposited by the [wrongdoers] into [fraudulent] accounts belonged to [the corporation]. As alleged, because the banks were ignorant of the *source* of the funds deposited into those accounts, they did not know that allowing the [wrongdoers] to withdraw money from the accounts was assisting a diversion of corporate funds—the primary violation. Again, aiding and abetting requires participation in a specific primary wrong 'with knowledge of the object to be attained.' [Citation.] That knowledge was absent here." (*Casey v. U.S. Bank National Association*, *supra*, 127 Cal.App.4th at p. 1152; see also *Fox Paine & Co., LLC v. Twin City Fire Insurance Company* (2024) 104 Cal.App.5th 1034, 1059, review granted Dec. 11, 2024, S287404 [addressing demurrer to cause of action for aiding and abetting breaches of fiduciary duty: " '[K]nowledge alone, even specific knowledge, is not enough to state a claim for aiding and abetting. California law "necessarily" requires that for aiding and abetting liability to attach, a defendant have made " ' "a conscious decision to participate in tortious activity for the purpose of assisting another

17

in performing a wrongful act." ' " [Citation.] . . . [A]n alleged aider and abettor must have "acted with the intent of facilitating the commission of that tort" ' "], quoting *George v. eBay, Inc.* (2021) 71 Cal.App.5th 620, 641.)

As in banking, limited duties pertain in the title insurance context. "[T]he function of title insurance is to protect against the possibility that liens and other items not found in the search or disclosed in the preliminary report exist. . . . ' "[A]ny title search or examination is performed by the insurer solely for the purpose of seeking to evaluate its underwriting decision in issuing the policy, not for the benefit of the insured." ' " (*Siegel v. Fidelity Nat. Title Ins. Co.* (1996) 46 Cal.App.4th 1181, 1192 (*Siegel*).) Thus, absent a contract to do so, "a title insurer generally owes no duty to undertake a thorough search of . . . records or to disclose impediments to title." (*Id.* at p. 1194.) " ' "Title insurance is a contract for indemnity under which the insurer is obligated to indemnify the insured against losses sustained in the event that a specific contingency, e.g., the discovery of a lien or encumbrance affecting title, occurs. [Citations.] The policy of title insurance, however, does not constitute a representation that the contingency insured against will not occur. [Citations.] Accordingly, when such contingency occurs, no action for negligence or negligent misrepresentation will lie against the insurer based upon the policy of title insurance alone. [Citations.]" [Citation.] A title policy "is not a representation that the title is in any particular condition." ' " (*Id.* at p. 1191.)

Similarly, when one claims a title insurer acts in the capacity of a sub-escrow, its responsibilities are "even more limited." (See *Siegel, supra,* 46 Cal.App.4th at pp. 1193-1194.) A third party engaged in that manner to simply record documents and pay out funds, does not become the fiduciary of

18

property purchasers for purposes of searching record or transmitting information regarding title. (*Id*. at p. 1194.)

### III. *Quiroga's Contentions as to the Probate Court's Reasoning*

With the foregoing principles in mind, we summarize Quiroga's contentions. She argues the probate court based its ruling on two erroneous findings. The first, according to Quiroga, is the finding that she did not allege facts indicating Fidelity was aware of Crist's age or failing health when it issued the title insurance policy. Quiroga maintains this was an incorrect statement of the law; that the law, section 15610.30, as evidenced by the civil jury instruction on the point (CACI No. 3100), does not require that Fidelity know Crist was an elder within the meaning of the statute.[6]

Quiroga argues the probate court's second flawed finding is that she did not sufficiently plead that Fidelity had actual knowledge of the wrongful conduct of third parties. This argument has two components. Quiroga contends that Fidelity erroneously argued below that a clear and convincing evidence standard of pleading and proof applied, and that the probate court's "reliance on Fidelity's assertion that the pleading requirement was similar to that of punitive damages in a civil action is erroneous as a matter of law." She argues that even if a claim of financial elder abuse requires specificity of pleading, the rule is relaxed when a defendant possesses superior knowledge of the facts.

---

6    In connection with this argument, Quiroga asks us to take judicial notice of the wording of CACI No. 3100 as an official act (Evid. Code, § 452, subd. (c)) or as a matter not reasonably subject to dispute (Evid. Code, § 452, subd. (h)). We deny the request. While CACI jury instructions are official instructions, they are not themselves the law and are not binding. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 217; *People v. Mojica* (2006) 139 Cal.App.4th 1197, 1204, fn. 4.) Even if we considered the instruction, it would not be relevant to our analysis, since as discussed, we do not assess the lower court's reasoning.

Quiroga further contends that the probate court erred by basing its analysis on a code section—section 15610.30, subdivision (a)(3)—that she did not plead as the basis for her claim and "that could not possibly give rise to [her] claim against Fidelity [that it assisted in the commission of financial elder abuse]."

The judgment containing the probate court's reasoning does not refer to a clear and convincing standard of proof or to heightened pleading requirements akin to those required for punitive damages. Elsewhere, Quiroga argues the court's holding was "[p]resumably" based on the "lack of a direct evidence allegation of Fidelity's actual knowledge based on upon a clear and convincing standard as asserted by Fidelity." We see no such reasoning by the probate court, and thus some of Quiroga's arguments are not supported by the record. We need not address these contentions further, which focus on the court's specific analysis. As stated above, we do not evaluate the lower court's reasoning. Our " ' " 'only task in reviewing a ruling on a demurrer is to determine whether the complaint states a cause of action.' " [Citations.] We do that independently [citation], regardless of reasons stated by the trial court.' " (*Kanter v. Reed* (2023) 92 Cal.App.5th 191, 203; see also *Endeavor Operating Company, LLC v. HDI Global Insurance Company* (2023) 96 Cal.App.5th 420, 442.)

We turn to that inquiry, and Quiroga's arguments pertaining to it.

IV. *Pleading Assistance of Financial Elder Abuse*

Quiroga argues that under the correct legal standards, she stated a claim that Fidelity assisted in financial elder abuse with allegations showing Fidelity's actual knowledge of the Andrades' wrongful conduct. Specifically, she points out her third amended petition alleges "Fidelity was aware that

. . . the Andrade[s] . . . were acting as escrow officers during the transaction in violation of law"; that "the Andrade[s] . . . were buying the property for approximately fifty percent (50 [percent]) less than its market value"; "Fidelity, who was a sub-escrow officer during the transaction, recorded the grant deed in violation of the terms of the escrow instructions and the HESCA at the express request of the Andrade[s]"; Crist "did not have his own real estate agent"; and "the Andrade[s] . . . failed to comply with numerous additionally provision [*sic*] of [the purchase agreement] and HESCA which grants [Crist] a 'continuing' right of rescission." According to Quiroga, these allegations are "more than sufficient" to raise an inference of Fidelity's actual knowledge as it "would have no other reason to violate its duty as a sub-escrow officer and open itself up to civil exposure for violation of the [purchase agreement] and the HESCA, other than to assist a long time business referral source with the commission of financial elder abuse." Quiroga also argues these facts "give rise to a duty" on Fidelity's part "to the parties to the transaction to only record the grant deed in compliance with the purchase agreement and the HESCA."

We disagree. The question is straightforward. "[S]trict[ly] appl[ying] . . . the pleading requirement for the knowledge element of the aiding and abetting claim" as we must (*Casey v. U.S. National Bank Association, supra*, 127 Cal.App.4th at p. 1152), we ask whether Quiroga's allegations establish Fidelity " 'actually knew [these] transactions were assisting [the Andrades] in committing [elder abuse].' " (*Das v. Bank of America, N.A., supra*, 186 Cal.App.4th at p. 745.) Stated another way, the allegations must show Fidelity "knew about [the Andrades'] schemes that victimized [Crist]" and "had actual knowledge of the underlying wrong it purportedly aided and abetted." (*Ibid*.)

21

Because financial abuse of an elder—a person aged 65 or older—was the "specific primary wrong" (*Casey v. U.S. Bank National Association*, *supra*, 127 Cal.App.4th at p. 1152) and scheme, Quiroga's failure to allege any facts suggesting Fidelity or any of its representatives personally dealt with Crist, or were aware of his age, personal circumstances and infirmities, is fatal to an aiding and abetting claim against it. The standard requires pleading showing " 'knowledge of the object to be attained' " (*Casey*, at p. 1152), which here is to take financial advantage of a person of a certain age. Absent facts indicating Fidelity's awareness of these circumstances, Quiroga cannot allege Fidelity actually knew of the Andrades' elder abuse scheme. Likewise, the mere fact that Fidelity may or should have been aware of the Andrades' violations of law or irregularities in the paperwork, by itself, is insufficient to establish Fidelity actually knew about those defendants' alleged scheme to take financial advantage of an elder, by selling/purchasing his property at below market value.[7] It is not enough that the transactions are suspicious, or that they were illegal. (*Casey,* at pp. 1151-1152 ["the banks' alleged knowledge of the [alleged wrongdoers'] suspicious account activities—*even money laundering—without more,* does not give rise to tort liability for the banks"].)

---

[7] Quiroga says Fidelity does not argue she was required to plead that it knew Crist was an elder but then contradicts herself, saying Fidelity argues assistance of financial elder abuse requires such an allegation. She asserts Fidelity did not cite authority for the proposition. Quiroga is incorrect. Fidelity extensively discussed *Das v. Bank of America, N.A., supra,* 186 Cal.App.4th 727 in its brief, and based on its summary of the case ("[a]s discussed above") asserted an aider and abettor must have actual knowledge of the tort being committed: "One cannot have actual knowledge that one is assisting in the tort of elder abuse without actual knowledge that the alleged victim is an elder such that the Elder Abuse Act applies."

Quiroga suggests that *Das* is no longer good law given the Legislature's 2008 amendments, which substantively changed the statute (see footnote 5, *ante*). But following the decisions in *Das* and *Casey v. U.S. Bank National Association*, *supra*, 127 Cal.App.4th 1138, the Legislature in 2013 amended section 15610.30 (to eliminate a Civil Code reference and insert section 15610.70 in subdivision (a)(3) (Stats. 2013, ch. 668, § 3)) without mentioning *Das* or disavowing its interpretation of the statute. "[W]hen the Legislature amends a statute, we presume it was fully aware of . . . prior judicial construction." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 572; see also *Move Eden Housing v. City of Livermore* (2025) 114 Cal.App.5th 1282, 1301, fn. 14.) Thus, we presume the Legislature was aware of *Das*'s application of common law aiding and abetting principles to evaluate a party's pleading of assistance in subdivision (a)(2). *Das* engaged in this very presumption when it reached its decision as to the construction of the term "assists" in former section 15610.30, subdivision (a)(2). (*Das v. Bank of America, N.A.*, *supra*, 186 Cal.App.4th at pp. 744-745.) The assistance provision, section 15610.30, subdivision (a)(2), has not materially changed since that time.

In her reply brief, Quiroga expands on her arguments concerning *Das*'s application. According to her, *Das v. Bank of America, N.A., supra,* 186 Cal.App.4th 727 created two standards for assistance: "direct assistance," which she disclaims any attempt to plead, and "indirect assistance," which assertedly "does not require a showing of substantial assistance as does direct assistance." She argues that when *Das* analyzed "indirect assistance" under the 2007 version of section 15610.30, subdivision (b), it assertedly did so "based on a much more difficult standard." She argues the "indirect assistance pleading standard" from *Das* "has no application to the current

iteration of the statute." Quiroga argues Fidelity misconstrues *Das* and its applicability.

In our view, it is Quiroga's arguments that misunderstand the Elder Abuse Act and *Das*. The Act addresses persons who take, secrete, etc. property, and those who "[a]ssist[ ] in taking, secreting" etc. (§ 15610.30, subd. (a)(1), (2).) Thus, the statute distinguishes not between direct and indirect assistance, but between direct abuse and indirect abuse via assistance. The court in *Das*, consistent with the statute, examined whether the plaintiff alleged the bank "directly engaged in financial abuse" or "assisted in financial abuse by third parties." (*Das v. Bank of America, N.A.*, *supra*, 186 Cal.App.4th at p. 744.) Apart from the addition in 2013 of the words "obtain" and "obtaining" to the list of verbs in those subdivisions, subdivisions (a)(1) and (a)(2) of section 15610.30 have not changed since *Das* was decided in 2010. Even the unpublished federal authority relied upon by Quiroga, *Kanter-Doud v. Wells Fargo Bank, N.A.* (E.D.Cal. 2024, No. 2:23-CV-00678-DAD-AC) [2024 WL 382325], acknowledges that the Legislature's subsequent amendments " 'did not materially alter subdivision (a)(2)' " of

24

section 15610.30. (*Id*. at p. *5.)[8] *Das* compels us to hold that Quiroga's third amended petition fails to state a cause of action for financial elder abuse against Fidelity.

Nor can Quiroga allege Fidelity engaged in direct financial abuse by somehow wrongfully using Crist's property. Citing *Andover Land Company v. Hoffman* (1968) 264 Cal.App.2d 87 and *Paslay v. State Farm General Insurance Company* (2016) 248 Cal.App.4th 639, Quiroga suggests this is the case where Fidelity assertedly failed to record the grant deed in compliance with the purchase agreement and HESCA, thus wrongfully using Crist's

---

[8] *Kanter-Doud v. Wells Fargo Bank, N.A.*, *supra*, 2024 WL 382325, supports our conclusion. There, an elderly woman in declining health was scammed by third parties to make multiple wire transfers from her bank, which she sued for financial elder abuse. (*Id*. at pp. *1-2.) After distinguishing between "direct financial abuse" and "indirect financial abuse" by assistance (*id*. at pp. *4-5), the court held the plaintiff did not state a cognizable indirect financial abuse claim. Specifically, the court stated the pleading "does not adequately plead facts supporting the allegation that defendant had actual knowledge of the wrongful conduct of the third parties involved in the [wire transfer] scam . . . ." (*Id*. at p. *6.) The court observed that the allegations permitted a reasonable inference "that the wire transfer requests were likely highly unusual banking transactions for plaintiff to engage in, and that the bank employees whom plaintiff interacted with should have known that something suspicious was occurring. Nonetheless, plaintiff has not alleged that she told defendant's agents about the conduct of the third party scam artists before the wire transfers were processed, nor does plaintiff allege that defendant otherwise had actual knowledge that she was being scammed at the time the wire transfers were processed. On the contrary, the [pleading] alleges that plaintiff and defendant engaged in no discussion about why she was conducting the wire transfers. . . . Thus, plaintiff's [pleading] is devoid of any alleged facts which, if proven, would demonstrate that defendant had actual knowledge of the scammer's wrongful conduct, a required element for an indirect financial elder abuse claim." (*Id*. at p. *6.) We note that in federal court, the Federal Rules of Civil Procedure apply, which state that knowledge may be averred generally. (*Bhatia v. Silvergate Bank* (S.D.Cal. 2024) 725 F.Supp.3d 1079, 1118-1119.)

25

property via a breach of the purchase agreement. *Andover Land Co.* does not involve a claim of elder abuse, and does not support a direct elder abuse claim against Fidelity.

*Paslay*, a case against a homeowners insurer who directly dealt with an elder in making policy payments and denying coverage for certain repairs (*Paslay v. State Farm General Insurance Company, supra*, 248 Cal.App.4th at p. 643), stands for the proposition that "a party may engage in elder abuse by misappropriating funds to which an elder is entitled under a contract." (*Paslay*, at p. 657.) But as *Paslay* points out, "[s]ubdivision (b) of section 15610.30 imposes an additional requirement beyond the existence of improper conduct" (*ibid*.), that is, a claim for wrongful use can lie only where the entity "knew or should have known that [its] conduct is likely to be harmful to the elder . . . ." (§ 15610.30, subd. (b); *Paslay*, at p. 657.) Thus, in the context of deprivation of property due an elder under a contract, subdivision (b) of section 15610.30 "imposes a requirement in addition to the mere breach of the contract term relating to the property . . . ." (*Id*. at p. 658.) "[W]rongful conduct occurs only when the party who violates the contract actually knows that it is engaging in a harmful breach, or reasonably should be aware of the harmful breach." (*Ibid*.) In *Paslay*, the Court of Appeal found the elder abuse claim failed because there was no evidence the insurer acted in bad faith or unreasonably in denying certain benefits under the homeowners policy. (*Id*. at p. 658.) Here, the absence of allegations showing direct dealings with Crist or awareness of his age and condition preclude any such knowledge by Fidelity, even assuming it did something contrary to the purchase agreement.

Our conclusion does not change in view of Quiroga's allegations concerning Fidelity's asserted status as a sub-escrow agent. Quiroga's

allegations are that it was *the Andrades* who handled the escrow for the transaction. She alleges they prepared the deed, informed Fidelity when to record it, paid all liens, prepared the seller's closing statement and issued a check for the sales proceeds. She alleges that at the Andrades' instruction, Fidelity recorded the affidavit of death and deed on December 27, 2018. Quiroga argues based on her allegations that "Fidelity had a duty as a sub-escrow agent to only record the grant deed after escrow had closed, which meant the seller was paid."[9] Quiroga relies in part on *Siegel, supra*, 46 Cal.App.4th 1181 for these propositions.

But *Siegel*, which emphasized the restricted liability of title insurers generally, does not assist Quiroga. There, the evidence established that in a property sales transaction, Fidelity was engaged by an escrow holder to hold loan proceeds, pay them out at the escrow holder's demand, and ensure the deeds were recorded. (*Siegel, supra*, 46 Cal.App.4th at p. 1193.) Fidelity was not given a copy of the escrow instructions but precisely complied with the escrow holder's oral instructions. (*Ibid*.) The plaintiff property purchasers brought breach of contract and negligence claims against Fidelity, grounded in the theory that it acted as an sub-escrow officer or their sub-agent, and thus should have disclosed a lien. (*Id*. at pp. 1185, 1188.) The evidence showed Fidelity's search department had obtained a copy of the lien before the closing. (*Id*. at p. 1188.)

---

9   We do not accept as true Quiroga's allegations that Fidelity insured the property for an amount that violated industry standards and its internal policies. Likewise, we need not accept as true her allegations that Fidelity "had actual knowledge of the Andrade[s'] wrongful conduct" in part because it had a copy of the purchase agreement and thus had "actual knowledge the Andrade[s] . . . were violating the law by conducting the escrow in a For Sale by Owner Transaction" and because it violated the HESCA. Such argumentative and conclusory statements are properly disregarded when considering the sufficiency of her pleading.

The Court of Appeal found no basis for liability against Fidelity on these facts. (*Siegel*, *supra*, 46 Cal.App.4th at p. 1189.) It observed that the escrow holder's duties to the plaintiffs were limited by the terms of the escrow instructions, and that being the case, "the responsibilities of Fidelity acting as sub-escrow were even more limited." (*Id*. at p. 1194.) "Fidelity was engaged to perform only the most rudimentary of the escrow functions—payout of funds and recordation of documents" and "did not undertake to prepare or review the escrow documents or ensure that the parties' instructions were carried out. We decline to hold a party so engaged thereby becomes the fiduciary of the purchasers for purposes of searching the records or transmitting information regarding title." (*Ibid*.)

Here, even assuming the truth of Quiroga's allegation that the Andrades acted as escrow agents, there are no facts alleged other than that Fidelity—alleged to be in possession of the purchase agreement and "ancillary" documents—issued title insurance at Andrades' request and complied with their instructions to perform rudimentary acts of recording the grant deed, as in *Siegel, supra,* 46 Cal.App.4th 1181. Quiroga nowhere alleges that written escrow instructions existed, nor can she where the purchase agreement shows there was no escrow. If Fidelity had any duty, it would have been defined and limited by the scope of escrow instructions, which do not exist here. (Accord, *Markowitz v. Fidelity National Title Company* (2006) 142 Cal.App.4th 508, 527.) But *Siegel* establishes that a title insurer's duties in this context are extremely circumscribed; Fidelity had no legal duty to review documents in escrow and no liability attaches to Fidelity for its alleged conduct. At best, Quiroga attempts to allege Fidelity breached the purchase agreement, which is attached to the pleading as an exhibit. That agreement states in addendum No. 1 that Crist was to receive

the balance owed—$39,000—30 days after the "recording of the grant deed/transfer of ownership." In any event, Quiroga was not a party to the purchase agreement, and nothing in it evinces an intent to benefit her. (Accord, *Markowitz*, at p. 527 [plaintiff purchaser was not a party to escrow instructions, and those instructions' language did not expressly evince the intent to benefit him, thus he was not a third party beneficiary of them; "[b]ecause [plaintiff] was not a party to the escrow and did not submit escrow instructions to Fidelity, Fidelity was not acting as his agent with respect to that transaction"].)[10]

## V. *Leave to Amend*

Based on *Siegel, supra,* 46 Cal.App.4th 1181, which rejected claims of breach of contract and negligence against the title insurer, we disagree with Quiroga's assertion that she can amend her pleading to state claims for those same causes of action against Fidelity. Quiroga also claims she can allege the

---

[10] We deny Quiroga's second request for judicial notice of the following documents: (1) a complaint by Ingo Schweitzer in Riverside County Superior Court Case No. RIC 408450; (2) an application by the California Association of Realtors for leave to file a amicus curiae brief and its amicus brief in an appeal (No. D049589) in the Schweitzer matter; (3) a redlined Notice of Default Purchase Agreement as revised by the California Association of Realtors in 2024; and (4) a sample Notice of Default Purchase Agreement as revised by California Association of Realtors in 2024. None of these items are relevant or necessary for our decision, which does not depend on whether the California Association of Realtors form purchase agreement complies with HESCA's provision, Civil Code section 1695.5. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [declining to take judicial notice of materials not "necessary, helpful, or relevant"]; *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 687, fn. 10 [appellate court may decline to take judicial notice of " 'matters not relevant to dispositive issues on appeal' "].) We grant Quiroga's request to judicially notice the 2007 version of section 15610.30. (Evid. Code, § 451, subd. (a) ["[j]udicial notice shall be taken of" "public statutory law of this state"].) That we do so does not change the outcome of this appeal.

following additional facts: while the Andrades were in escrow to sell the property, "they again opened a title insurance policy with their long-time title officer [from Fidelity], and attempted to order a policy for the refinance" which according to her, "evidence[s], or at least raise[s] the reasonable inference or [*sic*] a guilty mind, or at least a concern on the part of Fidelity not to insure the refinance after they recorded the grant deed in violation of the sales contract . . . and the HESCA. However, after another party insured the refinance, Fidelity had no issues working with the Andrade[s] . . . again." We cannot agree with Quiroga that such facts raise a reasonable inference of conduct sufficient to state a financial elder abuse claim or any other viable cause of action.

## DISPOSITION

The judgment is affirmed. Fidelity National Title Company shall recover its costs on appeal.


O'ROURKE, Acting P. J.

WE CONCUR:


IRION, J.


RUBIN, J.

30